FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2020 MAR 19 PM 2: 35
CLERK'S OFFICE
AT BALTIMORE
BY_____DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOHN W. DWYER, *et al.* | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. RDB-19-1272 |
| ALAN ZUCCARI, | * | |
| Defendant. | * | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM OPINION

This case arises from an alleged oral partnership agreement to conduct nursing home businesses exclusively through the use of a series of holding companies and subsidiaries. Plaintiffs John W. Dwyer ("Dwyer") and Capital Funding Group, Inc. ("CFG") (collectively, "Plaintiffs") allege that Defendant Alan Zuccari ("Zuccari" or "Defendant") has failed to repay expenses related to the settlement of professional liability claims arising from the nursing home business. In their nine-count Amended Complaint, Plaintiffs bring several common law claims, including breach of contract, breach of the partnership agreement, detrimental reliance/promissory estoppel, and unjust enrichment. Jurisdiction is predicated on diversity of citizenship. *See* 28 U.S.C. § 1332.

Presently pending is Zuccari's Rule 12(b)(6) and 12(b)(7) Motion to Dismiss Plaintiffs' Complaint, Motion to Transfer Venue, and Motion to Dismiss or Stay this Action (ECF No.

13).[1] Defendant's Motion (ECF No. 13) is GRANTED IN PART and DENIED IN PART. Specifically, Dwyer's claims set forth in Counts I, II, III, IV, V, VI, VII are DISMISSED WITH PREJUDICE as is CFG's claim in Count VIII. Only CFG's unjust enrichment claim (Count IX) may proceed. This Court DENIES Defendant's Motion to Transfer Venue and his Motion to Dismiss or Stay this Action.

## BACKGROUND

In ruling on a motion to dismiss, the factual allegations in the plaintiff's complaint must be accepted as true and those facts must be construed in the light most favorable to the plaintiff. *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). This Court may also consider documents attached to a motion to dismiss so long as they are "integral to the complaint and authentic." *Thompson v. United States*, RDB-15-2181, 2016 WL 2649931, at *2 n.4 (D. Md. May 10, 2016), *aff'd* 670 F. App'x 781 (4th Cir. 2016) (citation omitted). Finally, this Court makes reference to public court filings in related matters. *See Brown v. Ocwen Loan Servicing, LLC*, PJM-14-3454, 2015 WL 5008763, at *1 n.3 (D. Md. Aug. 20, 2015) (noting that courts "may take judicial notice of docket entries, pleadings and papers in other cases without converting a motion to dismiss into a motion for summary judgment"), *aff'd*, 639 F. App'x 200 (4th Cir. May 6, 2016).

---

[1] Defendant filed a similar motion seeking the same relief (ECF No. 10) before Plaintiffs filed an Amended Complaint. The Amended Complaint moots this motion. Accordingly, Defendant's first motion to dismiss (ECF No. 10) is MOOT.

This case arises from an alleged partnership between Dwyer and Zuccari to conduct nursing home businesses using a series of limited liability companies and other entities. (Am. Compl. ¶ 1, ECF No. 11.) Despite the enormous scale of their venture and the expenditure of millions of dollars, Dwyer and Zuccari never reduced the terms of their alleged partnership agreement to writing. (*Id.* ¶ 2.) As their business collapsed, Zuccari allegedly failed to remunerate Dwyer for the capital he expended settling a cascade of malpractice claims brought by nursing home residents. (*Id.* ¶¶ 44-67.) In this lawsuit, Dwyer and his company, Capital Funding Group, Inc. ("CFG"), attempt to collect from Zuccari a portion of the settlement payments made to those residents.

## I.    The Nature of the Alleged Partnership.

This lawsuit is premised on an oral partnership agreement "to carry out a business regarding nursing homes." (*Id.* ¶ 2.) The partnership allegedly originated in 2008, when Dwyer and Zuccari entered into an oral agreement to buy real properties which had been leased to nursing home operators. (*Id.* ¶ 13.) In furtherance of this plan, the two formed a holding company, CSCV Arkansas Realty, LLC ("CSCV Arkansas Realty" or "the holding company"), which was managed by Dwyer, Brian Reynolds, and Dwight Kouri. (*Id.* ¶¶ 13, 15.) Dwyer and Zuccari did not directly own CSCV Arkansas Realty. To create the holding company, Capital Funding Group, Inc. ("CFG"), a Maryland corporation for which Dwyer served as the chairman and sole owner,[2] reformed Capital Seniorcare Ventures, LLC. (*Id.* ¶¶ 7, 14.) When CSCV Arkansas Realty was formed, Capital Seniorcare Ventures, LLC became a 51% member.

---

[2] Plaintiffs' Disclosure of Affiliations and Financial Interest (ECF No. 2) indicates that Dwyer owns 100% of the stock in CFG.

(*Id.* ¶ 15.) For his part, Zuccari used his company, AJZ Capital, LLC ("AJZ Capital"), as an investment vehicle to become a 49% member in the holding company. (*Id.*) After its formation, CSCV Arkansas Realty purchased 12 real properties where nursing homes operated, and leased the properties to licensed operators. (*Id.*) The 12 real properties were separately titled to several single-purpose LLCs,[3] all of which were subsidiaries of CSCV Arkansas Realty. (*Id.*)

Plaintiffs allege that CSCV Arkansas Realty was merely one aspect of a continuing nursing home enterprise pursued by Dwyer and Zuccari. After CSCV Arkansas Realty was sold for a 137% return on investment, Dwyer and Zuccari orally agreed to invest in the same nursing home operations which had leased property from their now-defunct holding company. (*Id.* ¶¶ 16-17.) Plaintiffs allege that Zuccari was incentivized to continue his partnership with Dwyer because he owned nursing home service providers, including Alan J. Zuccari, Inc. and Servarus Corp. (*Id.* ¶ 18.) Dwyer allegedly felt comfortable investing with Zuccari because Zuccari had assured him that he had sufficient knowledge to manage risks associated with potential professional liability claims. (*Id.* ¶¶ 19-20.)

Dwyer and Zuccari proceeded to form a network of holding companies and member LLCs to carry out their nursing home operations. For example, in 2011, CFG (allegedly controlled by Dwyer) and Brian Reynolds formed CSCV Holdings, LLC. (*Id.* ¶ 21.) Zuccari formed Arkansas Nursing Home Acquisition, LLC ("ANHA"). (*Id.*) The two LLCs then

---

[3] Maryland limited liability companies, or "LLCs," are unincorporated business organizations formed in accordance with the Maryland Limited Liability Company Act. *See* Md. Code Ann., Corps. & Ass'ns §§ 4A-101, *et seq.*

4

formed Arkansas SNF Operations Acquisition, LLC ("Ark I"). (*Id.*) Other holding companies followed, each formed in a similar fashion (the "Arkansas" holding companies). (*Id.* ¶ 23.) Further permutations developed when holding companies allegedly controlled by Dwyer and Zuccari's LLCs partnered with holding companies controlled by Tim Nicholson to create even more holding companies (the "Lyric" holding companies). (*Id.* ¶ 24.) These holding companies went on to form or acquire subsidiary companies. (*Id.* ¶ 26.) Dwyer and Zuccari ensured that they were never members, managers, or officers of any of the holding companies or their subsidiaries. (*Id.* ¶ 27.) Instead, Reynolds and others were named as managers of the Arkansas and Lyric holding companies. (*Id.* ¶¶ 23-24.)

## II.    The Collapse of the Nursing Home Businesses.

In mid-2014, Zuccari, Dwyer, and Nicholson decided to wind down their investments in the Arkansas and Lyric holding companies, in part because of a cascade of lawsuits brought by nursing home residents alleging malpractice related to the care they received. (*Id.* ¶ 44.) As the lawsuits progressed, Dwyer and Zuccari "made the decision to settle" claims asserted against the holding companies and their subsidiaries, and then instructed Reynolds, as a manager of the LLCs, to conduct the settlements. (*Id.*) To fund the settlements, which exceeded the entities' insurance coverage, Dwyer and Zuccari liquidated assets associated with various entities under their control. (*Id.* ¶ 47.) For example, proceeds from the sale of a subsidiary holding real property might be used to pay liabilities incurred by a nursing home subsidiary. (*Id.* ¶ 55.)

5

In 2016, Dwyer and Nicholson made a "conditional payment" to AJZ Capital which caused the present controversy. In February 2016, Dwyer, Zuccari, and Nicholson sold real property belonging to certain Lyric subsidiaries and used the bulk of the funds to cover operating expenses or to pay liabilities associated with the malpractice claims. (*Id.* ¶ 48.) Of these funds, $7,000,000.00 was allocated to a bank account associated with Chai Facilities Acquisition Company, LLC, one of the "Lyric" holding companies whose members were comprised of two LLCs: Lyric Real Estate Holdings, LLC, which was allegedly controlled by Dwyer and Zuccari; and Bay Front Property, LLC, which was allegedly controlled by Nicholson. (*Id.* ¶¶ 24, 48, 52.) Zuccari's share of $2,856,000.00 was sent to his investment vehicle, AJZ Capital. (*Id.* ¶¶ 48, 52.) Immediately prior to this payment, Zuccari agreed that when additional funds were needed to satisfy liabilities "allocable to their respective partnership interests," he would pay his respective share of the February 2016 payment back to the partnership. (*Id.* ¶ 49.)

In January 2017, Reynolds presented Zuccari with a settlement of a group of malpractice claims and a capital call for funds to pay the settlements. (*Id.* ¶ 56.) Zuccari responded that he agreed that the cases should be settled, but that he did not have enough money to fund them. (*Id.* ¶ 57.) To pick up the slack, CFG began to fund the settlements by wiring funds to operating accounts associated with the Arkansas and Lyric companies. (*Id.* ¶ 60.) As of the filing of the Amended Complaint, CFG has allegedly paid $7,300,000.00 to fund settlements authorized by Zuccari, and another $320,000.00 was expected to be paid. (*Id.* ¶¶ 60, 67.) Despite incurring $3,600,000.00 in liabilities according to his ownership percentage

6

in the partnership, Zuccari has allegedly not returned any portion of the conditional payment made to AJZ Capital in February 2016. (*Id.* ¶¶ 60, 80.)

## III.   The Virginia Lawsuit.

In 2017, Dwyer filed a lawsuit against Zuccari in the Circuit Court of Fairfax County, Virginia, captioned *John W. Dwyer v. Alan Zuccari*, CL 2017-18287. In that case, Dwyer made substantially the same claims as those now advanced in this Court. Unlike in this case, Dwyer was the only Plaintiff. The First Amended Complaint brought claims against Zuccari for breach of contract (Counts I and II); detrimental reliance/promissory estoppel (Counts III and IV); contribution (Count V); and unjust enrichment (Count VI). (First Amended Complaint, ECF No. 13-3.)

The case proceeded to a jury trial on January 28, 2019. After Dwyer rested his case, Zuccari moved to strike Dwyer's evidence. While this motion was pending, Dwyer moved for nonsuit, *i.e.*, to voluntarily dismiss his case, and the motion was granted. (1/31/2019 Trial Tr. 98:21-99:12, ECF No. 13-7.) As a result, the jury did not deliberate, and a judgment was not entered. In May 2019, Zuccari appealed three post-nonsuit issues to the Supreme Court of Virginia: (1) a March 1, 2019 Order granting Plaintiff's Motion to Enforce Agreed Protective Order; (2) a March 2, 2019 Order denying Defendant's Motion for Sanctions; and (3) an April 19, 2019 Final Order concerning Plaintiff's Motion for Rule to Show Cause. (Notice of Appeal, ECF No. 13-4.)

7

## IV. Federal Court Litigation.

In the wake of the voluntary dismissal of the Virginia case, Dwyer and Capital Funding Group, Inc. ("CFG") commenced this action on April 30, 2019. (Compl., ECF No. 1.) An Amended Complaint was filed on June 18, 2019 after Defendant moved to transfer, dismiss, or stay this action. (Am. Compl., ECF No. 11.) The Amended Complaint brings nine claims, labeled as follows:

| Count | Title |
|-------|-------|
| I | Zuccari Liability to Dwyer for Breach of Contract—Conditional Payment |
| II | Zuccari Liability to Dwyer for Breach of Partnership Agreement |
| III | Zuccari Liability to Dwyer for Detrimental Reliance/Promissory Estoppel—Partnership Settlements |
| IV | Zuccari Liability to Dwyer for Detrimental Reliance/Promissory Estoppel—Conditional Payment |
| V | Zuccari Liability to Dwyer for Equitable Contribution for Partnership Debts |
| VI | Unjust Enrichment |
| VII | Zuccari Breach of Contract Liability to Dwyer |
| VIII | Zuccari Subrogated Liability to CFG |
| IX | Zuccari Unjust Enrichment Liability to CFG |

Now pending is Defendant's Rule 12(b)(6) and 12(b)(7)[4] Motion to Dismiss Plaintiffs' Amended Complaint, Motion to Transfer Venue, and Motion to Dismiss or Stay this Action. (ECF No. 13.)

## STANDARD OF REVIEW

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.

---

[4] Defendant seeks dismissal pursuant to Rule 12(b)(7) of the Federal Rules of Civil Procedure, which permits dismissal for "failure to join a party under Rule 19." Defendant argues that dismissal is warranted under this Rule because Plaintiffs have failed to join a member of the partnership. This Court does not address this issue because Plaintiffs have failed to allege the existence of a partnership.

R. Civ. P. 8(a)(2). Rule 12(b)(6) authorizes the dismissal of a complaint if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Generally, to withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009) (internal quotations and citation omitted). "A formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Similarly, "an unadorned, the-defendant-unlawfully-harmed-me accusation" is insufficient. *Iqbal*, 556 U.S. at 678.

In reviewing a motion to dismiss under Rule 12(b)(6), the Court may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## ANALYSIS

The parties advance very different interpretations of the Plaintiffs' allegations, and these interpretations color their arguments. Plaintiffs argue that the alleged partnership between Dwyer and Zuccari encompasses all of the transactions alleged in the Amended Complaint. Although all transactions between them were effectuated by a network of investment vehicles, holding companies, and subsidiaries, Plaintiffs allege that the partnership operated outside of these networks. Essentially, Plaintiffs seek to disregard the separate entity status which would ordinarily be afforded to the various business entities described in the Amended Complaint. Dwyer and CFG petition this Court to hold Zuccari liable to them for

a portion of CFG's settlement expenses with respect to the various malpractice claims brought by nursing home residents.

In the Defendant's view, the Amended Complaint describes a series of transactions between dozens of corporate entities only indirectly connected to Dwyer and Zuccari. Zuccari emphasizes that Chai Facilities Acquisition Company, LLC, not Dwyer, allegedly paid the disputed $2,856,000.00 to AJZ Capital, not Zuccari, and that CFG, not Dwyer, provided the funds to settle the professional liability claims. Based on this view of the pleadings, Defendant presents a litany of arguments for dismissal, including failure to adequately plead partnership and lack of standing to sue.[5] Alternatively, Defendant requests this Court to transfer this case to the United States District Court for the Eastern District of Virginia or to abstain from deciding this matter while the related state court proceedings are on appeal to the Supreme Court of Virginia.

Counts I, II, III, IV, V, VI, VII, and VIII are unavailing because they require a complete disregard for the separate entity status afforded to corporations, LLCs, and other entities. Maryland law does not recognize the sort of boundless, ill-defined "partnership" between Dwyer and Zuccari carried out exclusively through the use of business entities as described in the Amended Complaint. Accordingly, all claims explicitly dependent upon the existence of a partnership (Counts II, V, and VIII) are without merit. Additionally, all claims asserted by Dwyer (Counts I, II, III, IV, V, VI, and VII) fail because he lacks standing to sue, as it is clear from the Amended Complaint that all of the alleged transactions in this lawsuit took place

---

[5] This Court only reaches those arguments which are necessary to resolve the pending motion.

between business entities and all harms are legally attributable to those entities, not to Dwyer. Accordingly, all claims brought by Dwyer against Zuccari fail and only CFG's unjust enrichment claim may proceed (Count IX). This Court declines to transfer this action because CFG, the sole remaining Plaintiff, is a Maryland corporation and has appropriately exercised its right to avail itself of the jurisdiction of this Court on the basis of diversity of citizenship. Additionally, abstention is unnecessary because the Virginia litigation terminated in a nonsuit and never addressed the merits of the dispute.

## I.  Plaintiffs' Claims are Improperly Grounded in an Admitted Disregard of the Corporate Form.

The principal problem affecting the Plaintiffs' claims is their confessed disregard for the separate legal status ordinarily afforded to corporate entities and the individuals managing them. Maryland law[6] regards "a corporation and its stockholders—or even a single stockholder—[as] wholly separate entities." *Baltimore Line Handling Co. v. Brophy*, 771 F. Supp. 2d 531, 552 (D. Md. 2011) (quoting *DeWitt Truck Brokers, Inc. v. W. Ray Flemming Co.*, 540 F.2d 681, 683 (4th Cir.1976)). Limited liability companies are similarly regarded as distinct from their members. *Kreisler v. Goldberg*, 478 F.3d 209, 213 (4th Cir. 2007) (applying Maryland law). This separate entity status is "jealously guarded." *Brophy*, 771 F. Supp. at 552. As this Court has previously explained, Maryland upholds the corporate form even on occasions when a sham corporation has been created solely to avoid liability. *Iceland Telecom, Ltd. v. Info. Sys. &*

---

[6] The parties appear to agree that Maryland law applies, as they both cite Maryland law. In a diversity case, federal courts apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941). To resolve contractual disputes, Maryland follows the rule of *lex loci contractus*, which requires application of the law of the state where the contract was made. *Kramer v. Bally's Park Place, Inc.*, 311 Md. 387, 390, 535 A.2d 466, 467 (1988). This Court applies Maryland law to resolve the contract claims and quasi-contract claims presented in this action because the parties allegedly used CFG's Baltimore, Maryland headquarters to enter into the various agreements described in the Amended Complaint. (Am. Compl. ¶ 9.)

11

*Networks Corp.*, 268 F. Supp. 2d 585, 591 (D. Md. 2003) (citing *Bart Arconti,* 275 Md. 295, 309, 340 A.2d 225 (1975)).

According to the Amended Complaint, the parties gave little regard for the separate legal status afforded to individuals and the corporate entities with which they are affiliated. Dwyer and Zuccari's alleged partnership involved "directing the use and establishment of various business entities" to carry out a business involving the acquisition of nursing home real properties, operations, and companies. (Am. Compl. ¶ 1.) They allegedly lacked legal authority "over most of the business entities" which they had formed, yet were nonetheless able to control their affairs and authorize settlements on their behalf as "disclosed or undisclosed principals." (*Id.* ¶ 4.) The Amended Complaint makes no effort to hide this disregard for the corporate form, stating that: "Even though neither Dwyer nor Zuccari is a member, manager, or officer of any Holding Company or Subsidiary, all decisions to invest in, divest from, distribute to investors, or settle substantial alleged liabilities of any Holding Company or Subsidiary were made jointly by Dwyer and Zuccari as partners . . . ." (*Id.* ¶ 27.)

The structure of the alleged partnership is so tenuous that it is difficult, if not impossible, to disentangle the actions of the individual partners and the transactions of the entities they allegedly controlled. For example, the Amended Complaint periodically alleges that Dwyer has paid certain debts but elsewhere claims that Dwyer "caused CFG" to pay those same debts. *Compare id.* ¶ 112 ("Dwyer has paid those debts that he and Zuccari agreed to incur as partners . . . .") *with id.* ¶ 114 ("Dwyer caused CFG as his agent to make the payments for which Zuccari is liable."). Dwyer also simultaneously alleges that both Zuccari and AJZ Capital received the February 2016 conditional payment. *Compare id.* ¶ 49 ("Dwyer and

Nicholson allowed a payment to be made to Zuccari in February 2016 in the gross amount of $2,856,000.") *with id.* ¶ 52 ("Zuccari was asked to elect the recipient of his conditional payment, and he chose AJZ Capital."). Like the Plaintiffs themselves, the Amended Complaint manifests some difficulty grasping the distinction between legal entities and individuals.

These problems have several detrimental effects on Plaintiffs' legal claims. Dwyer and Zuccari's nebulous enterprise is not a partnership under Maryland law. The Amended Complaint describes only a series of *ad hoc* transactions carried out by investment vehicles, holding companies, and subsidiaries. The Amended Complaint does not describe any profits being distributed among the partners, but rather only alleges that money was funneled among the various business entities. Additionally, Dwyer's decision to conduct his affairs entirely through a morass of holding companies and subsidiaries deprives him of standing to assert these claims. Only CFG—the corporate entity which funded the settlements—may bring a claim against Zuccari.

## II.   Plaintiffs Have Failed to Allege the Existence of a Partnership.

Counts II, V, and VIII[7] are premised on the existence of an overarching partnership which permitted Dwyer and Zuccari to enter into agreements with one another without operating through the holding companies and subsidiaries they allegedly controlled. Plaintiffs broadly allege that Dwyer and Zuccari formed a partnership "to carry on as co-owners of a

---

[7] In Count II, Plaintiffs allege that "Zuccari is liable to Dwyer under general partnership law." (Am. Compl. ¶ 90.) In Count V, Plaintiffs allege that "Zuccari and Dwyer as partners are jointly and severally liable for the debts of the partnership that they incurred by agreeing to settle liabilities with certain third parties." (*Id.* ¶ 111.) Count VIII is explicitly premised on the allegation that "[t]he debts paid by Dwyer that were agreed to by Dwyer and Zuccari are debts of both Dwyer and Zuccari personally as partners." (*Id.* ¶ 130.)

13

business for profit regarding nursing homes." (Am. Compl. ¶ 2.) Defendant argues that Plaintiffs have failed to allege the existence of a partnership agreement because the Amended Complaint does not describe the terms of the partnership, how ownership interest in the partnership was allocated, how profits were divided, or discuss other details. Defendant also generally protests that the alleged partnership business was not carried out by the partners themselves, but through a series of limited liability companies and at least one corporation, CFG. Plaintiffs respond that the Amended Complaint provides enough factual content to support the existence of a partnership because it "expresses how the partnership was formed and grew in scope . . . and alleges facts and circumstances implying a partnership agreement." (ECF No. 15 at 16.)

The Maryland Revised Uniform Partnership Act ("RUPA"), Md. Code Ann., Corps. & Assn's §§ 9A-101, *et seq.*, defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." § 9A-101(i). A partnership may be formed without adherence to formal filing requirements, such as Articles of Incorporation or an Operating Agreement. *MAS Associates, LLC v. Korotki*, 465 Md. 457, 476, 214 A.3d 1076 (Md. 2019). As partnerships are governed by general contract law principles, they "require[] mutuality, a meeting of the minds and agreement, and . . . definite terms and specific intent among other things." *Korotki*, 465 Md. at 477, 214 A.3d 1076 (quoting *Garner v. Garner*, 31 Md. App. 641, 657, 358 A.2d 583 (1976)). In the event that the parties do not memorialize the terms of their partnership agreement, "the existence of the partnership depends on the intent of the purported partners." *Id.* (quoting Christine Hurt, D. Gordon Smith, Alan R. Bromberg & Larry E. Ribstein, *Bromberg & Ribstein on Partnership* § 2.04[A], at 2-29 (2d ed.

14

2019)). The requisite intent to form a partnership may be gleaned from the purported partners' "acts and conduct." *Korotki*, 465 Md. at 476, 214 A.3d 1076 (quoting *Morgart v. Smouse*, 103 Md. 463, 468, 63 A. 1070 (1906)).

To determine whether a partnership exists absent a written agreement, under Maryland law a court may consider several factors, including: (1) whether the members of the partnership exercised management and control over the partnership; (2) whether the members made capital contributions to the partnership; and (3) whether the parties shared profits and losses. *See Korotki*, 456 Md. 483-493, 214 A.3d 1076. As RUPA provides, however, the sharing of property or profits alone is insufficient to demonstrate the existence of a partnership. § 9A-202(d)(1).

The Amended Complaint in this case does not provide sufficient factual content to support the legal conclusion that a partnership existed between Dwyer and Zuccari. The Amended Complaint generally alleges that Dwyer and Zuccari entered into an evolving partnership related to nursing homes which was never memorialized in writing and was conducted exclusively through a series of corporate entities. This enterprise lacks the ordinary hallmarks of a partnership. Aside from a few *ad hoc* agreements to sell assets over which they had no formal control, the Amended Complaint does not describe any terms governing the alleged partnership. The partners do not appear to have contributed any capital to the partnership; rather, Dwyer is alleged to have contributed capital to CFG, which in turn disbursed money to settle claims filed against it and other entities. The partners are not alleged to have pooled assets in a common bank account over which they exercised control; instead, assets of the individual entities were comingled within the accounts of various holding

15

companies, then subsequently distributed "as needed either within or beyond" the holding companies. (Am. Compl. ¶ 65.) The partners themselves are not alleged to have obtained any profit from the partnership. One of the only examples of a purported partnership distribution—the sale of certain Lyric subsidies—was made to AJZ Capital, not to a member of the partnership.

The Plaintiffs' confessed reliance on a disregard for the separate entity status afforded to corporations and LLCs renders their claim of partnership untenable. Although RUPA does not *per se* prohibit "an association conducting its operations in conjunction with an LLC to intend to form a partnership," *Korotki*, 465 Md. at 478, 214 A.3d 1076, the exclusive use of such entities to carry on the alleged partnership affairs upends the traditional notion of a partnership and is antithetical to Maryland law's protection of the separate entity status enjoyed by LLCs and corporations. In this case, the parties' alleged partnership is so tenuous that it is difficult to disentangle the actions of the partnership from the actions of the separate legal entities which they purportedly controlled. Plaintiffs' failure to adequately describe the contours of the purported partnership and express disregard for the corporate form require dismissal of Counts II, V, and VIII.

## III.   Dwyer Lacks Standing to Sue for Losses Suffered by Corporate Entities.

In Counts I, II, III, IV, V, VI, and VII, Dwyer brings claims against Zuccari for his alleged failure to return the conditional payment made to AJZ Capital in February 2016. Each count frames Zuccari's obligation to pay differently—for example, as arising out of a breached oral contract, a breached partnership agreement, or from theories of recovery like promissory

estoppel and unjust enrichment. Defendant argues that Dwyer lacks standing under Article III of the United States Constitution because CFG and other corporate entities, not Dwyer, are alleged to have suffered harm by Zuccari's alleged failure to pay. (ECF No. 13-1 at 27.) Dwyer responds that he possesses the requisite standing based on his allegations that he was the sole source of funding for CFG, which lost money as a result of Zuccari's alleged failure to pay, and because CFG was acting as his "agent" when it disbursed settlement funds. Both arguments are flawed. Dwyer satisfies the requirements of Article III standing, but Maryland law precludes him from filing suit on behalf of a corporation like CFG for harm it has suffered by the actions of third parties. Accordingly, Dwyer lacks prudential—not Article III— standing.

"Standing is an 'essential and unchanging part' of Article III's case or controversy requirement." James M. Wagstaffe, *Federal Civil Procedure Before Trial* § 24-III (2019) (quoting *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000)). The standing doctrine has two components: Article III standing, which implicates the jurisdiction of the federal courts, and prudential standing, "which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" *United States v. Windsor*, 570 U.S. 744, 757, 133 S. Ct. 2675 (2013) (quoting *Elk Grove Unified School St. v. Newdow*, 542 U.S. 1, 11-12, 124 S. Ct. 2301 (2004)); *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 753 (4th Cir. 2013). "The 'irreducible minimum requirements' of standing that a plaintiff bears the burden of establishing under Article III are (1) an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robinson*, 136 S.

Ct. 1540, 1547 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992)); *David v. Alphin*, 704 F.3d 327, 333 (4th Cir. 2013).

Certain prudential considerations may nevertheless deprive a plaintiff of standing "even when Article III permits the exercise of jurisdiction." *United States v. Windsor*, 570 U.S. 744, 760, 133 S. Ct. 2675 (2013). For example, "prudential standing encompasses 'the general prohibition on a litigant's raising another person's legal rights.'" *Elk Grove*, 542 U.S. at 12, 124 S. Ct. 2301 (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S. Ct. 3315 (2004)). The so-called shareholder standing rule is related to this principle. *Franchise Tax Bd. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 336, 110 S. Ct. 661 (1990). This rule, which is recognized under Maryland law,[8] holds that a lawsuit to recover damages for an injury to the corporation "can be brought only in the name of the corporation . . . and not by an individual stockholder." *Oliveira v. Sugarman*, 451 Md. 208, 240, 152 A.3d 728 (2017). Even the sole shareholder of a corporation "does not have standing to assert claims alleging wrongs to the corporation." *Smith Setzer & Sons, Inc. v. S.C. Procurement Review Panel*, 20 F.3d 1311, 1317 (4th Cir. 1994). As Judge Chasanow of this Court previously noted in *Seton v. William Council*, DKC-06-1246, 2008 WL 11509636 (D. Md. Aug. 12, 2008), "under Maryland law, 'it is considered a fundamental rule that even a sole shareholder does not have standing to assert claims alleging wrongs to the corporation.'" *Seton*,

---

[8] In a diversity case, a party must establish standing under both Article III and state law. James M. Wagstaffe, Federal Civil Procedure Before Trial § 24-III (citing *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 173 (2d Cir. 2005)). Accordingly, the United States Court of Appeals for the Fourth Circuit has looked to state law to determine whether prudential standing has been satisfied. *See Smith Setzer & Sons, Inc. v. South Carolina Procurement Review Panel*, 20 F.3d 1311, 1317 (4th Cir. 1994) (applying North Carolina's shareholder standing rule).

18

2008 WL 11509636, at *2 (quoting *Maryland Community Health Systems, LLP v. Glendening*, 115 F. Supp. 2d 599, 605 (D. Md. 2000))).

In this case, Dwyer has Article III standing but lacks prudential standing. Dwyer alleges that he is the chairman, sole owner, and sole source of capital for CFG. CFG's corporate disclosure form indicates that Dwyer owns 100% of its stock. Dwyer alleges that CFG has made settlement payments to cover Zuccari's obligations when Zuccari failed to contribute to the settlements. Drawing all inferences in favor of Dwyer, the Amended Complaint adequately alleges that Zuccari's failure to pay caused Dwyer to lose money. This loss of capital suffices as an injury in fact which is attributable to Zuccari's conduct, and would be redressable by a judgment in Dwyer's favor. Accordingly, Dwyer satisfies the bare minimum requirements of Article III standing.

Nevertheless, the shareholder standing rule—a matter of prudential standing— precludes Dwyer from personally bringing this action. Dwyer alleges that the "conditional payment" of February 2016 was made by a third-party entity, Chai Facilities Acquisition, LLC, to AJZ Capital.[9] Allegedly, Zuccari had promised Dwyer that he would return this money if needed. When Zuccari failed to live up to this promise, CFG picked up the slack. Under the shareholder standing rule, only CFG can sue for an injury it has suffered, even if the injury ultimately redounds to its sole shareholder, Dwyer. In other words, Dwyer lacks prudential standing to sue on behalf of a loss which is attributable to his company, CFG. Accordingly,

---

[9] More specifically, the Amended Complaint first alleges that the February 2016 conditional payment was made to Zuccari and subsequently states that the payment was made to AJZ Capital. *Compare* Am. Compl. ¶ 49 ("Dwyer and Nicholson allowed a payment to be made to Zuccari in February 2016 in the gross amount of $2,856,000.") *with Id.* ¶ 52 ("Zuccari was asked to elect the recipient of his conditional payment, and he chose AJZ Capital.").

all claims brought by Dwyer individually against Zuccari arising from his alleged failure to pay (Counts I, II, III, IV, V, VI, and VII) fail as a matter of law.

## IV.   CFG Has Stated a Claim for Unjust Enrichment Against Zuccari.

Only one claim remains: CFG's unjust enrichment claim against Zuccari. This claim is neither dependent on the existence of a partnership nor runs afoul of the shareholder standing rule. Unjust enrichment is a quasi-contractual claim asserted in the absence of an explicit agreement. *Cty. Comm'rs of Caroline Cty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96, 747 A.2d 600, 607 (2000). To state a claim for unjust enrichment under Maryland law, a plaintiff must ultimately demonstrate that (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant had an appreciation or knowledge of the benefit; and (3) "[t]he acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Mohiuddin v. Doctors Billing & Mgmt. Sols., Inc.*, 196 Md. App. 439, 449, 9 A.3d 859, 865 (2010) (citing *Alternatives Unlimited, Inc.,* 155 Md. App. 415, 496, 843 A.2d 252 (2004)). A benefit may be conferred when the plaintiff pays a debt owed by the defendant, regardless of how the payment is made. *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 298-99, 936 A.2d 343 (2007). To determine whether the benefit has been inequitably retained requires a "fact-specific balancing of the equities." *Id.* at 301. As a general rule, however, "a plaintiff may recover for a payment or payments to a third party as long as the plaintiff was not officious in making such payment or payments." *Hill*, 402 Md. at 305, 936 A.2d 343. The plaintiff is not officious if it acts "under a legal compulsion or duty" or "acts to protect [its] own property interest." *Id.* at 305.

CFG may maintain an unjust enrichment claim against Zuccari based on the facts alleged in the Amended Complaint. CFG's unjust enrichment claim is premised on the allegation that "CFG has paid debts which Zuccari is liable for by agreement and/or law." (*Id.* ¶ 134.) The Amended Complaint appears to describe several obligations giving rise to a debt: (1) Zuccari's promise to "repay [the] respective share of the February 2016 payment back to the partnership" (Am. Compl. ¶ 49); (2) Zuccari's contractual liability to various settling parties based on his status as a "disclosed or undisclosed principal" who had authorized Reynolds, as representative of the LLCs, to settle malpractice claims (*Id.* ¶ 58); and (3) Zuccari's liability as a party to the settlements themselves, in cases in which he was named as a party (*Id.* ¶ 45).[10] Based on Zuccari's alleged assurance that he would fulfill his promise to fund the settlements, CFG disbursed funds "to operating accounts for Arkansas or Lyric to fund settlements agreed to by Dwyer and Zuccari." (*Id.* ¶ 60.) By funding the settlements in this manner, Zuccari was relieved of his immediate burden of expending capital. CFG did not act as a "mere volunteer" or "officious payor" when it assisted Zuccari in this fashion, because the settlements terminated lawsuits in which it had been named as a defendant. *Hill*, 402 Md. at 301, 936 A.2d 343. By funding the settlements, CFG benefitted both itself and Zuccari. Nevertheless, Zuccari allegedly has failed to make any contributions toward these settlements, and has obtained release from these lawsuits. Accordingly, CFG's unjust enrichment claim (Count IX) may proceed.

---

[10] At this stage, this Court does not resolve whether all of these sources of liability are valid. At a minimum, the Amended Complaint sufficiently alleges that Zuccari promised to pay settlements to which he himself was a party. Accepting this allegation as true, Zuccari was unjustly enriched when CFG paid these debts for him.

## V.     Transfer is Not Appropriate.

Defendant petitions this Court to transfer venue to the Alexandria Division of the United States District Court for the Eastern District of Virginia "should any claim herein proceed." In support of his motion, Defendant argues that venue is not appropriate in this district because this case revolves around out-of-state litigants: Dwyer is a resident of Florida, Zuccari resides in Virginia. Alternatively, even if venue were proper, Defendant seeks transfer primarily because an initial lawsuit was brought in Virginia state court.

Pursuant to 28 U.S.C. § 1391(b), venue is appropriate in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." § 1391(b)(2). When considering a motion to transfer venue pursuant to 28 U.S.C § 1404(a), this Court has previously noted that it must consider "(1) the weight accorded the plaintiff's choice of venue, (2) witness convenience and access, (3) convenience of the parties, and (4) the interest of justice." *MTB Servs., Inc. v. Tuckman-Barbee Const. Co.*, RDB-12-02109, 2013 WL 1224484, at *5 (D. Md. Mar. 26, 2013) (quoting *Lynch*, 237 F. Supp. 2d 615, 617 (D. Md. 2002)).

This case will remain in this Court. The only remaining plaintiff in this case is Capital Funding Group, Inc. ("CFG"), a Maryland corporation. The Amended Complaint alleges that Dwyer and Zuccari conducted their business affairs from CFG's Maryland headquarters. (Am. Compl. ¶ 9.) These ties to Maryland render this Court an appropriate venue pursuant to § 1391(b)(2). Transfer is unnecessary. CFG's Maryland headquarters renders the District of Maryland the most convenient venue for both the witnesses and the parties, as CFG's corporate records will be of paramount importance to this case. Although Plaintiffs initially

22

pursued this action in Virginia state court, this fact alone does not tip the scales in favor of transfer. Accordingly, Plaintiffs' request to transfer this case is DENIED.

## VI.    Abstention is Not Required.

As another alternative to dismissal or transfer, Defendant petitions this Court to dismiss or stay this action because certain collateral issues have been appealed from the Fairfax County Circuit Court. Zuccari claims that dismissal or a stay is warranted as an exercise of *Colorado River* abstention because the Supreme Court of Virginia may remand the case for further proceedings, thereby giving rise to duplicative litigation and potentially contradictory rulings. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

In *Colorado River*, the United States Supreme Court made clear that the pendency of an action in state court does not pose an absolute bar to proceedings concerning the same or a similar matter in federal court. *Colorado River*, 424 U.S. at 817. As a general rule, "our dual system of federal and state governments allows parallel actions to proceed to judgment until one becomes preclusive of the other." *Chase Brexton Health Servs., Inc. v. Maryland*, 411 F.3d 457, 462 (4th Cir. 2005). Indeed, federal courts have a "virtually unflagging obligation" to exercise the jurisdiction given to them, *Colorado River*, 424 U.S. at 817, and "have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not," *Chase Brexton*, 411 F.3d at 462 (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)).

There is, however, an "extraordinary and narrow exception" to exercising jurisdiction. *Colorado River*, 424 U.S. at 813, 96 S. Ct. 1236. A federal district court may abstain from hearing a case over which it has jurisdiction in "exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing

23

interest." *Id.* (quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-89, 79 S. Ct. 1060 (1959)). The burden for the party seeking a stay in federal court is high: "[T]he task [of the district court] is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' ... to justify the surrender of jurisdiction." *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 25–26, 103 S. Ct. 927 (1983) (citation and internal quotation marks omitted).

Abstention under *Colorado River* is only appropriate if this Court first determines that the federal and state suits are parallel. Next, this Court must balance several factors to determine whether the case represents an "exceptional circumstance." The following six such factors have been identified by the United States Court of Appeals for the Fourth Circuit: "(1) whether the subject matter of the litigation involves property where the first court may assume *in rem* jurisdiction to the exclusion of others; (2) whether the federal forum is an inconvenient one; (3) the desirability of avoiding piecemeal litigation; (4) the relevant order in which the courts obtained jurisdiction and the progress achieved in each action; (5) whether state law or federal law provides the rule of decision on the merits; and (6) the adequacy of the state proceeding to protect the parties' rights." *Chase Brexton*, 411 F.3d at 463-64.

The circumstances in this case do not justify abstention because the state court proceedings have essentially concluded as a result of Dwyer's nonsuit. Virginia law permits a plaintiff to take a "nonsuit" before a "motion to strike" is granted (the Virginia equivalent of Rule 50 of the Federal Rules of Civil Procedure) or the case is submitted to a fact finder, so long as the defendant has not brought a counterclaim. Va. Code § 8.01-380. A case terminating in a nonsuit does not have preclusive effect, but should be treated "as if the suit

24

had never been filed." *Winchester Homes, Inc. v. Osmose Wood Preserving, Inc.*, 37 F.3d 1053, 1058 (4th Cir. 1994). Accordingly, a nonsuited case is not a parallel proceeding warranting *Colorado River* abstention. *See Roberts v. Berkle Welding & Fabricating, Inc.*, 3:17CV315, 2018 WL 4189626, at \*4 (E.D. Va. Aug. 31, 2018) (finding that nonsuit rendered *Colorado River* abstention unnecessary). As a result of his nonsuit, Dwyer's case in the Fairfax County Circuit Court has ended without a decision on the merits and is not a bar to federal court litigation. The pending appeal has no bearing on this analysis. Dwyer's appeal focuses on rulings made by the Circuit Court on matters ancillary to the merits of the case, including a discovery ruling and the denial of his motion for sanctions. Any rulings made on these post-nonsuit matters will have little, if any, effect on the outcome of this case. Accordingly, Defendant's motion to dismiss or stay this case based on *Colorado River* abstention is DENIED.

## CONCLUSION

For the reasons set forth above, Defendant's first Rule 12(b)(6) and 12(b)(7) Motion to Dismiss Plaintiffs' Complaint, Motion to Transfer Venue, and Motion to Dismiss or Stay this Action (ECF No. 10) is DENIED AS MOOT. Defendant's second Rule 12(b)(6) and 12(b)(7) Motion to Dismiss Plaintiffs' Complaint, Motion to Transfer Venue, and Motion to Dismiss or Stay this Action (ECF No. 13) is GRANTED IN PART and DENIED IN PART. Specifically, Counts I, II, III, IV, V, VI, VII, and VIII are DISMISSED WITH PREJUDICE. Only CFG's unjust enrichment claim (Count IX) may proceed. This Court DENIES Defendant's Motion to Transfer Venue and his Motion to Dismiss or Stay this Action.

A separate Order follows.

Dated: March 19, 2020

_Rel D. Bnstt_

Richard D. Bennett
United States District Judge